Case number 11-1334 et al. Alliance of Automobile Manufacturers et al. Petitioners v. Environmental Protection Agency Mr. Wareham for the Petitioners, Ms. McDonough for the Respondent Mr. Wareham Good morning, Your Honors. Good morning. May it please the Court, my name is Bill Wareham. I'm here on behalf of Petitioners, American Petroleum Institute, and the Engine Products Group, which is comprised of the Alliance of Automobile Manufacturers, Association of Global Automakers, the National Marine Manufacturers Association, and the Outdoor Power Equipment Institute. I'm here to address all issues related to this case, except for those related to the separate brief filed by the Engine Products Group addressing EPA's denial of the group's legacy fuels petition. With me at counsel's table is Bill Gehry. He's available to answer any questions you may have on that particular issue. I'd like to address three key issues presented in our briefs. First of all, standing. Secondly, EPA's failure to adopt adequate misfueling measures. And thirdly, the unlawful third-party liability provisions in the rule. With regard to standing, both API and the Engine Products Group have firmly established standing. With regard to API, the American Petroleum Institute, its members are the object of the rule, and under this Court's longstanding precedent, standing should be self-evident. Well, they're objects of the rule to the extent that they engage in sales of E50. Right. But, Your Honor, we believe that the mere existence of the rule, it immediately, upon publication, immediately changed the rights of my clients and impacted current business decision-making. So the companies have to factor in the existence of the regulation in making any decision as to whether to put E15 into the marketplace and how it's going to be put E15 into the marketplace. Do you think our decision in grocery manufacturers has any impact on what you just said? We believe this case is fundamentally different from grocery manufacturers, Your Honor. In grocery manufacturers, the decision at issue was a waiver decision by U.S. EPA that authorized it. I understand that you're focusing on a different subject, but in grocery manufacturers, didn't the Court say that the petroleum group, the fact that they had not submitted any evidence that they were producing E15 left them uninjured or unaffected by this directly, unregulated by it? Isn't that what the grocery manufacturers said? If that's the case, how is it any different here? Well, I believe, again, Your Honor, I believe the key difference there is that with regard to the American Petroleum Institute, this Court said the waiver is an authorization. It does not impose obligation. And, therefore, if any API member chose to put E15 into the marketplace, any harm that flows from that would be a result of the decision to market E15 and not an obligation created by the waiver. This case is fundamentally different than that because we're talking about a legislative rule. EPA has created a rule that imposes mandatory obligation on any I don't understand the difference between this and grocery manufacturers. Just help me with that. Because in grocery manufacturers, the Court relied on the fact that the waiver authorized the production of E15, but there was no evidence in the record submitted by your clients that they were producing it. That's correct, Your Honor. Okay, so why is that any different here? That's my only question, simple question. Yes, and Because, am I right, there's no affidavit in this case that your clients are producing E15? That's correct, Your Honor. Right. So why is it any different from grocery manufacturers? Because the existence of the legislative rule, and I apologize, I'm repeating myself, but I think it's a very important point. The existence of the legislative rule changed API members' future rights and obligations and immediately requires API members to factor the existence of the rule into any decision it makes as to whether to put E15 in the market. So today, as members of API are making compliance plans with regard to the applicability of the misfueling rule and plans with regard to putting E15 in the marketplace, this rule is impacting those decisions. Is there an affidavit from your client that says that you're planning to introduce E15 into the market and the existence of the mitigation rule is being, is restraining or affecting that decision? We do not have such an affidavit, Your Honor, but we do have in the record, Your Honor, at JA245, which are API's comments on the proposed misfueling mitigation rule, facts indicating the predominant position that API members hold within the fuels marketing and fuel sales industry. They held that position consistent with neither selling E15 nor contemplating sale of E15. Isn't that true? Yes, Your Honor. Ultimately, the E15 waiver and the misfueling mitigation rule that's at issue in this case today, EPA did not issue the waiver and issue the misfueling mitigation rule because it wanted to. It didn't do those things because it had spare time on its hands and thought that would be good for public policy. The agency did that because it's administering the Renewable Fuels Program, and Congress mandated ever-increasing amounts of ethanol to be blended in the U.S. gasoline supply. Well, that's a separate question. I mean, another angle that you might have taken would be to say that the Renewable Fuels mandate is on the brink of forcing your members to sell E15, and whether or not that's true, it's not a contention that you make or support. Yes, Your Honor. We believe that fact is judicially noticeable. EPA engages in notice-and-comment rulemaking every single year to establish how much ethanol and other renewable fuels should be blended into the gasoline supply. In the 2013 decision, it didn't seem to rest at all on sales of E15. It's hard to tell, but they essentially seem to treat it as negligible. And, Your Honor, in 2013, and you're correct to point this out, U.S. EPA did not impose a mandate that would have required an amount of fuel to be blended into the national gasoline supply that would force sales of E15. EPA intentionally placed the blending mandate lower than that, and they did that. And my clients, the American Petroleum Institute, are actively engaged in that rulemaking, seeking to discourage the agency from requiring a national amount of fuel to be blended that would require its members to blend E15. Well, I mean, I guess it sounds from what you're saying as if so far, speaking of the 2013 rulemaking, you have prevailed, at least in the sense of getting a limit that does not force your members to sell E15. And you're additionally saying that you have serious hopes of continuing to prevail in that way. Is that a fair summary of what you said? That's correct, Your Honor. The reason my clients are engaged in these cases, they were engaged in the E15 waiver case, engaged in the smith's fueling case, engaged with the agency with regard to each annual decision made about how much renewable fuel to blend into gasoline supply. And our interest absolutely is to encourage the agency not to adopt a mandate that would require the sale of E15 fuel. Your Honor, I guess that the one conclusion that could be drawn is that your successes in one domain, the renewable fuels mandate, makes the risk of injury to you comparatively remote in this domain. Well, the other point I'd like to make, and I'm switching gears a little bit, but I think it's highly relevant to this discussion. Congress had a choice in the Clean Air Act and the judicial review provisions of the Clean Air Act as to when to provide for judicial review. And traditionally, historically, under the Administrative Procedure Act, judicial review typically occurs at the point of implementation or enforcement. Congress expressly chose to do something very different here. Under the Clean Air Act, Section 307, Congress decided to provide for pre-enforcement review. And requires, except in very limited circumstances, that if an entity wants to challenge the validity of an EPA legislative rulemaking, that challenge must be filed within 60 days of publication in the Federal Register. Does that language report cover the issue of the process of enforcement? In other words, suppose one of your members is sued for, either sued by a consumer, I guess that's probably the realistic problem, sued by a consumer for consequences of selling E15, and you point to defects, let's assume, in this rule. Is it clear that the preclusion effect of the provision you're talking of would prevent the court from addressing that? Well, Section 307B1. Normally these time limit provisions don't do that, but they can be worded so that they do. Well, Section 307B1, and I mentioned with limited exceptions when I described the pre-enforcement reviews nature of that provision, the limited exception is except when the grounds for the challenge arise after the judicial review period, so the so-called grounds. Well, that would be true if this court finds you without standing. I would hope it would be true because, you know, my fundamental point here is if Congress requires, you know, an entity who seeks to challenge a legislative rule to file that challenge except in limited exceptions within 60 days, EPA could evade review every single time it publishes a rule simply by making the rule effective at some later time beyond the judicial review period, and EPA does that all the time. Yeah, but most of their rules apply to firms that are already engaged in the underlying project, which is regulated. But, for instance, EPA adopts new source performance standards that only apply upon the construction or modification of an affected entity, and who's to say whether the next entity will construct or modify a week, a month, or a year after the rules. There's some alarming language in grocery manufacturers. Yes, Your Honor, and with all due respect, we disagree with the holding with regard to American Petroleum Institute, and, you know, a fundamental concern we had with the outcome of that case that we have with this case, given this line of questioning, is if the predominant fuels manufacturers and distributors in the United States don't have standing, don't have a right to challenge a legislative rule that clearly is designed to apply to them and will apply to them when they engage in this activity, who has a right that, you know, if we don't have standing here, then EPA is taking actions that... It would be a very different case if you had affidavits saying you planned to be such a producer. I mean, then you'd have standing. You're correct. And you don't have that. You agreed with me. You don't have that case. So... That's correct. It's not that no one could ever challenge this. It's that you don't... You haven't given the... You haven't supplied the evidence you need to gain article 3 standing. And as... You're correct, Your Honor. And as I described earlier, we're engaged in advocacy on many fronts and litigation on many fronts seeking to discourage the agency from adopting or requiring the dissemination of a fuel that we think is harmful to the engines for which it's been deemed acceptable. Right. Right. Okay. Can I just... This is a question about one of your clients. Is Murphy USA the same as Murphy General? I cannot answer that question, Your Honor. I don't know. I ask because it takes only a few seconds to find on the web that Murphy USA is selling E15. Yes, Your Honor. And we, as recently as last week, polled members of the American Petroleum Institute. And to our knowledge, no member is selling E15 blend stock or E15, no member of API, at least as of a week ago when we checked. Okay. Thank you, Your Honor. Thank you. Good morning, Your Honors. My name is Eileen McDonough. I'm here from the Department of Justice on behalf of EPA. With me at council table is Susan Staley of EPA's Office of General Counsel and also Brian Boynton who represents the interveners on behalf of EPA. Can you all hear me satisfactorily? Yep. We can. The key question to focus on here, with respect to standing, is the applicability of grocery manufacturers. One fact that is very important to differentiate in evaluating petitioner's argument is the fact that the case before the court does not address whether E15 should be used in the vehicles for which it was authorized by the waivers. The waivers were a self-contained rule. Sale is authorized by that, and sales can proceed regardless of how the court chooses to rule on the present case. Much of the harm alleged by plaintiffs, or I'm sorry, by petitioners, and addressed in their briefs relate to the sale and the use and the distribution of the E15. That will happen in accordance with the waivers. So what's in front of the court. Now, wait. Are you suggesting, suppose they had evidence that E15 was being produced by their members. Are you saying they still wouldn't have standing? That might very well change the outcome. Well, isn't that your point then? It's not that E15 was about a waiver in this case. I thought your point was that there's no evidence they're producing it. Well, there is no evidence that they're producing it. And if they had submitted affidavits. In fact, counsel just said they weren't, right? He just told us that. He just said that they're not. He very candidly told us that. Yes. So at this point, there's no reason for them to claim that they can be harmed by rules that are designed to minimize misfueling. Because none of their people or their members are going to sell, or at least now. We don't know what they're going to do. Well, we don't know what they're going to do because they haven't submitted any declarations regarding their plans. The government is not saying that under no circumstances whatsoever could these parties have demonstrated standing. The test is whether their standing is self-evident. Perhaps they could have established standing if they had introduced affidavits regarding the plans and interests of their members. But they chose not to. So the question is whether it's self-evident based on the briefs. And we believe that it's not self-evident. Because these measures are designed to mitigate the possibility of misfueling. These are not relevant to groups that choose not to participate in the E15 market, which is... When you say choose, I mean a lot of choices in business are sharply constrained by competitive factors, regulation, and so forth. Business choices are constrained by many different things. And to the extent that a specific rule from EPA would be such a constraint and how important it would be, I believe would be an evidentiary matter, not something that is self-evident. Suppose they had an affidavit which said, yes, we're not producing E15 and we don't have any plans to because of the mitigation rules. It's just not adequate to protect us. Would that give them standing? If they were saying that the adequacy or the lack thereof was the sole or at least a very significant factor in that decision, they could, I think, have done that. There are many factors that would go into such a decision, not the least of which is how these companies anticipate consumers responding. If the fuel is as disfavorable as they allege, there's a good chance not too many people will choose to buy it and not many outlets will choose to sell it. That's a market decision. And what? It's not a market decision, therefore what? It's not traceable to EPA's decision. Don't market factors combine with regulatory factors? I believe in some circumstances they can, but again, that would be an evidentiary question as to what is driving these decisions. And at this point... Are you saying that if a firm feels driven into this market by a combination of regulation and market competition, it can't sue, it can't get standing without establishing that the regulatory factor was pivotal? Not pivotal, but at least a substantial consideration in their business deliberations, because this court, looking at the brief alone, can't evaluate what weight the business decision makers are affording to the many different elements in a complicated decision. Can I go back to a discussion where your colleague was up, and that's the effect of 307B1? There are two questions. One is your understanding that if all the affected parties are barred by warrant of standing during a period allowed by Congress, they're barred forever? And related to that is the question of parties that are barred for whatever reason by not suing in time, their ability to challenge the regulation in the course of its application. I mean, it would be quite extraordinary and raise interesting issues if it were the case that not suing at a point where you can't sue would bar issues forever. That is simply the result, though, of how Congress has chosen to draft... You think that is the result, so you contest your colleague's suggestion, I think he suggested, perhaps not, that they wouldn't be able to sue in the event that warrant of standing barred them during the critical period. Well, I think that what it would focus on is quite why they did it. It doesn't matter why they did it if they can't. The statute says that an action by an administrator with respect to which review could have been obtained if a party has no standing... The language seems to protect them in the event that they lose the warrant of standing. Yes, because I believe that would be a ground for them to say they could not have pursued it, especially in a case like this where they had bought it to the court. They're not relying on their own legal opinions. They would have a decision from this court saying you couldn't have challenged it. Mr. Wierm didn't get around to talking about presumptive liability, but I'd like to ask you about that. Because it does seem to me that there's a potential, at least, for this refueling... to impose presumptive liability upstream. That is, even to people who just provided the pure gas that went into blended fuels. In that case, presumably, they would have standing. Yes, that is the closest, I believe, point on which API comes to self-evident standing. But I still don't believe that they're over that threshold. I think if they had supplied this court with an affidavit explaining how actual members would be directly affected, they could have been over that hurdle. But the industry is very complicated, and I just think that if they had provided the court more information about exactly how members would have been affected, it's possible they could have crossed the threshold. On that particular issue, but that material is not in front of the court. Does EPA or EIA collect data on which companies are selling what fuels? EPA does keep track informally, and my understanding from the program... Obviously, this is not in the record or anything, but my understanding is that there are less than 60 stations currently selling E15, and that it is a minute part of the... An August 2019 item on the web says 90, but go ahead. The Intervenors Council would be better suited if you have particular questions about that. As I said, I was just going from informal discussion. Okay, go ahead. I'm sorry, I interrupted you. Your time is up. Did you have anything else? I interrupted your answer. Go ahead and answer your question. Let's assume it's 60. This is all a very developing market. At this point, there is not a lot of concrete information available. To the extent that the petitioners do believe that they'd be adversely affected, they should have provided the court with more specific declarations explaining exactly how... What I was getting at was the question of whether a government agency, which actually has data in its files showing that the petitioner is outstanding, is acting properly to deny standing when it knows the contrary. It's just on the hypothesis that EPA knew the contrary, which you say is doubtful. At this point, because the market is so new, I don't think it's fair to say that EPA has a factual basis for showing that... You're going back to the hypothesis and its validity. I'm asking you about what should prevail if the hypothesis is correct. EPA does have the necessary information in its files. Can it just sit back and say, you didn't file an affidavit? Technically, the way the law has been upheld by this court is that the burden of standing rests upon... That's true. On the other hand, the petitioners are allowed to rely on things that are, I forget the exact phrase, common knowledge and something in open files of EPA might be said to be common knowledge. Your Honor, we would not deliberately, we would not make a standing argument if we did not think it was valid, whether that was based on our appraisal of prior court decisions or on information in our files. We wouldn't make the arguments. You're saying it would be enough if there was information in EPA's files about the sale of E15 and if all you're insisting on is that plaintiffs who have the burden at least point to it, right? That could be. What I'm saying is that as a matter of practice, we would not bring a standing argument to this court unless we believed there was a problem. For example, in the grocery manufacturer's case, it was interveners, not EPA that originally raised the standing issue. Have you changed your mind about the case? Well, what we have done is decided that this court set out parameters and everybody has to meet those parameters in future cases. You know, if you had not issued that decision, our position here may have been different, but you did and we have to live with it. So, my time? If the court has no further questions. Did Mr. Murna have any time left? Would you like a minute? Okay. Thank you. I'd just like to make two quick points. First of all, it is very odd that API members would have to engage in activity that we consider harmful. As we've talked about, we don't support EPA's waiver decision on E15 and we have been engaging in advocacy seeking to discourage the agency from requiring it to be put into the market, although the possibility exists that we will have to put it in the market if the mandate gets set at an appropriate level in the future. But with the 60-day judicial review period provided by Section 307B1, it just doesn't seem rational that API members would have to engage in advocacy seeking to discourage the agency from requiring it to be put into the market, although the possibility exists that we will have to put it in the market if the mandate gets set at an appropriate level in the future. So, my second point, and thank you for indulging me and Judge Brown, you raised that. Part of our argument on standing is that API members could do everything that they need to do to comply or avoid having to comply with the Misfueling Mitigation Rule and still face liability under this rule because the rule imposes third-party liability. So, an API member can be found liable for the actions or omissions of an independent third party that just happens to be further down the fuel distribution chain than the API member itself. Why didn't you submit an affidavit to that effect? We believe that's evident under the law, Your Honor. We didn't need an affidavit to establish that as a fact. The regulation is law and the regulation provides for presumptive liability.